# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

July 8, 2020

**BY ECF**

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Courtroom 1106
New York, NY 10007

      **Re:**   **United States v. Anthony Flynn,**
           **19 Cr. 585 (LGS)**

Dear Judge Schofield,

     With the Court's leave, I am filing a redacted copy of the sentencing submission that I transmitted to Your Honor by e-mail on Monday, July 6, 2020 in the above-captioned case.

                 Respectfully Submitted,

                 /s/_____
                 Andrew Dalack
                 Assistant Federal Defender

Cc:    Government Counsel

**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
*Executive Director*
*and Attorney-in-Chief*

Southern District of New York
*Jennifer L. Brown*
*Attorney-in-Charge*

July 6, 2020

**BY EMAIL & ECF**

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Courtroom 1106
New York, NY 10007

Re:   <u>United States v. Anthony Flynn,</u>
      <u>19 Cr. 585 (LGS)</u>

Dear Judge Schofield,

Anthony Flynn has been trapped in a vicious cycle of neglect, abuse, drugs, and dysfunction since the day he was born. Anthony's mother and grandmother, his main parental figures, abused methamphetamines and allowed Anthony (as early as age four) to drink alcohol, sometimes to the point of getting drunk. Anthony's abuse of marijuana, PCP, and heroin eventually led him to abuse methamphetamines, just like his mother and grandmother. Over the last decade, Anthony has been toggling between jail and life on the streets, homeless and struggling to survive between fixes. Anthony's lifelong struggle with addiction is responsible for his revolving-door relationship with the justice system, including his presence before this Court. Without his drug addiction, which is borne out of an unstable upbringing and early exposure to life on the streets, Anthony would not be in the predicament he finds himself in today. An appropriate sentence for Anthony must therefore account for his mitigating personal history and his need for rigorous in-patient medical care to overcome his pernicious substance abuse disorder. A sentence of no more than 60 months' imprisonment followed by three years' supervised release is sufficient, but not greater than necessary, to achieve the statutory goals of sentencing under 18 U.S.C. § 3553(a).

Judge Lorna G. Schofield                                                    Page 2
United States District Judge

## I.      Overview

Initially charged with robbing two banks in Manhattan, it did not take Anthony long to come clean, waive jurisdiction, and plead guilty to the string of five bank robberies across Manhattan, Queens, and Staten Island that he committed in 2019 in violation of 18 U.S.C. § 2113(a). Compare Complaint at Dkt. No. 1 with Superseding Information at Dkt. No. 13. And in pleading guilty, Anthony also readily stipulated that the "career offender" provision of U.S. Sentencing Guidelines § 4B1.1 applies to his case. These were difficult decisions for Anthony to make, and doing so in such a clear and swift manner was a big step for him—one that reflects the dire nature of Anthony's situation. Although Anthony has been to jail and prison before, and has survived some harrowing moments on the street, this case—his first brush with the federal system—has been different. Between the extreme circumstances that brought him to this point; the nightmarish conditions Anthony has endured throughout his confinement at the Metropolitan Correctional Center; his coming to grips with the prospect of being sentenced to upwards of 15 years in prison; and his near-total isolation from his family, Anthony has hit rock bottom.

But in refusing to give up on himself, Anthony has responded to his situation by taking control of his life with unprecedented tenacity and vigor. To better understand the root causes of his dysfunction, Anthony earnestly participated in a rigorous neuropsychological examination conducted by Dr. Chriscelyn Tussey, whose report is attached as Exhibit A. As Dr. Tussey explains, Anthony's "chronic substance abuse has likely resulted in changes to his overall functioning which has manifested in a variety of difficulties, such as memory deficits and limitations in impulse control." Ex. A at 1. Consequently, Anthony's "current legal circumstances seem most attributable to his substance addiction." Id. Dr. Tussey has helped Anthony become more aware of his cognitive deficiencies, triggers, and mental health needs. As a result, Anthony is better equipped to finally break his cycle of addiction and pursue more prosocial, positive behavior.

Indeed, given the unmistakable connection between his criminality and drug abuse, Anthony has worked tirelessly with a social worker from the Federal Defenders, Taylor Lauesen, to learn how to deal more productively with stress and overcome his past trauma. Anthony and Taylor have worked closely to develop a cogent and realistic reentry plan designed to tackle Anthony's overlapping mental health and substance abuse needs. See Exhibit B. And throughout his time at the MCC, Anthony has also worked with Dr. Jolie Avena, who runs the facility's substance-abuse treatment program. While waiting patiently on the waitlist for Dr. Avena's clinic, Anthony enthusiastically participated in an entry interview and

Judge Lorna G. Schofield                                                                Page 3
United States District Judge

obtained materials directly from Dr. Avena to get a jumpstart on a more formal treatment curriculum.

There is no sugarcoating Anthony's conduct in this case; he intimidated bank tellers at five different banks to obtain money to feed his drug addiction. In one instance, he flashed a blade. In another, he punched an unsuspecting customer in the face when the teller refused to comply with his demand note. There is also no denying Anthony's conviction history, which the defense acknowledges triggers the "career offender" provision of the U.S. Sentencing Guidelines and its corresponding range of 151 to 188 months' imprisonment. But while Anthony's offense conduct and criminal history are important considerations for the Court, they are not the only aspects of Anthony's life to which the Court must give weight. Just as the Court cannot stop at the Guidelines in arriving at an appropriate sentence, it would be an injustice to reduce Anthony to the "career offender" label and simply sentence him accordingly. Much of Anthony's tumultuous life was all but preordained, set in motion by the self-destructive choices of the very adults who were supposed to care for and raise him. Now, having realized that this is likely his last chance to change his life's trajectory and avoid dying on the streets or in prison, Anthony has done everything possible to turn a desperate situation into a positive one. His character, life history, and present circumstances are far more complicated and compelling than that suggested by the ominous "career offender" label.

Although Anthony understands that he must be punished for his offenses in a manner that deters him and others from committing similar crimes in the future, a fair and just punishment must account for Anthony's dysfunctional childhood and substance abuse disorder—mitigating aspects of his character and record that have unquestionably played a dominant role in his development. Anthony's sentence must also account for the punishment he has already endured, including his experiences while confined at the MCC during the unprecedented COVID-19 pandemic. Given all that Anthony has experienced, both before and after his arrest in this case, a sentence of no more than 60 months' imprisonment followed by three years' supervised release is justified, and sufficiently balances the need to promote public safety and respect for the law, provide adequate general and specific deterrence, and most effectively afford Anthony the correctional treatment and medical care he requires. 18 U.S.C. § 3553(a).

Judge Lorna G. Schofield                                                    Page 4
United States District Judge

## I.      Background

### A. Anthony Flynn's exposure to trauma and drug abuse from a young age laid the foundation for a dysfunctional adolescence and adulthood.

Anthony did not have any positive role models as a child or adolescent. Anthony's father, whom Anthony met when he was 16, was absent for much of his life. And when he was present, Anthony's father was violent. Because Anthony's mother and grandmother were themselves addicted to methamphetamines, they often ignored Anthony and left him to his own unguided devices. At around fourth or fifth grade, when Anthony was barely 10 years old, he was sent to a school psychologist after stating that he would "chop off [his] hand." Ex. A at 9. After this incident, Anthony was placed in a special education program that appeared to help Anthony make progress. Id. Unfortunately, with such an unstable home life, Anthony's situation quickly regressed and turned bleak: "In sixth grade I wanted a good report card, in seventh grade I was just worried about money to get drugs." Id.

Anthony's history of substance abuse started at the age of four. When he was a child, he would "run to the freezer and sip beer at family functions." Ex. A at 7. Instead of disciplining him, or teaching him about the dangers of alcohol abuse, his family "thought that it was a little funny" when he got drunk. By age 13, Anthony began using marijuana daily. He would black out, throw up, and do it all over again. By age 15, Anthony was addicted to cocaine, and at 18 he began using crack cocaine, PCP, heroin, and methamphetamines regularly. Anthony was so reliant on substances from such an early age that he even sniffed paint fumes to get high.

Anthony began living on the streets at age 13, which coincided with his premature exit from high school. By the time Anthony made it back to his grandmother's house in Staten Island when he was 18, his grandmother was using heroin more regularly. Anthony's return to his grandmother's home came with an ultimatum: Anthony could stay with his grandmother, but only if he bought her heroin. Anthony and his grandmother began using heroin together until he finally left and became homeless again in 2003. For the next seven years, until he was incarcerated in 2010, Anthony was homeless. He survived on his own with very little family support, doing whatever he could to feed his addiction.

Without having had the benefit of long-term, in-patient substance abuse and mental health treatment, many of Anthony's previous attempts at addressing his problems have been in vain. For example, in 2018, Anthony went to the emergency

Judge Lorna G. Schofield                                                          Page 5
United States District Judge

room at Jamaica Queens Hospital to see a mental health professional. Ex. A at 5. But
because a blood test indicated that he had drugs in his system, his parole officer was
called and he was not admitted. And in February of 2019, Anthony sought a
psychiatric diagnostic evaluation at the Ramon Velez clinic, primarily to help treat his
panic attacks and anxiety. Ex. A at 7. Indeed, Anthony recalls having panic attacks
since 2009, and recalls a particularly severe one in May 2019 on a subway car shortly
after he learned that the police were likely after him. Ex. A at 5-6. Anthony continues
to have these panic attacks every couple months, particularly when he begins
ruminating about his circumstances. Id. at 6. Sometimes, the attacks have no
particular trigger at all. These attacks are scary; Anthony has a hard time breathing and
staying conscious. Anthony has learned to cope somewhat with these attacks by
"taking deep breaths and focusing on something pleasant." Ex. A at 6.

        Although Anthony's visits to the Ramon Velez clinic provided him with some
clarity into his mental health needs, these and other sporadic, out-patient encounters
fell short of the rigorous, in-patient assistance Anthony required to stay sober, which
set the stage for the instant offense.

## B. Anthony Flynn's instant offense conduct was driven by his drug addiction.

        Sadly, the impetus behind Anthony's string of bank robberies in 2019 was all-
too predictable. Strung out and looking for a quick fix, but lacking any money,
Anthony went to a drug dealer he knew for a handout. After the dealer turned him
away, Anthony stumbled upon a small dose of crack cocaine on the ground. He
picked it up, smoked it, and then began a rapid downward spiral that drove him to
rob five banks across three boroughs, all in an effort to get money to buy more drugs.
Anthony's memory of these events is rather hazy; he does not recall all of the specifics
surrounding the robberies. But he does remember with some clarity the June 6, 2019
robbery in Queens—the one in which he punched an unsuspecting customer. This
event devastated Anthony. He was so shocked and angry at himself for having
punched someone that he called his mother sobbing after the incident. Anthony will
never live this down.

        Watching the videos from the robberies that the government produced in
discovery has made Anthony feel even more ashamed of himself. He does not
recognize the person in those videos. Possibly most impactful on Anthony was seeing
how many other people, including children, were milling about the banks when he
robbed them. That he put so many people in danger, scaring them and others just to
get a fix, has brought everything into focus for Anthony. And the excruciating

Judge Lorna G. Schofield                                                                 Page 6
United States District Judge

conditions at the MCC, including long lockdowns with periods of little to no activity, have given Anthony plenty of time to realize that this is his last chance to get his life back on track.

### C. Anthony Flynn has experienced harsh and unprecedented confinement conditions at the MCC.

Anthony's confinement at the MCC has been extraordinary. When he first arrived at the facility in August 2019, he experienced strong heroin withdrawals. Prior to the MCC, Anthony was housed at Rikers Island,[1] where he received 100 mg doses of Methadone to help him ease off the heroin. But when he arrived at the MCC, he was immediately switched to a 40 mg regiment—a steep drop-off that caused Anthony to experience excruciating stomach pain, chills, night sweats, insomnia, and mental anguish. At one point, Anthony was housed with another person whose role was to ensure that Anthony did not commit suicide.

In early October 2019, Anthony sliced his finger on a razor he was using to shave. The cut was so severe that it required seven stitches, but Anthony had to wait 18 hours before he was taken to a hospital. And although the hospital staff recommended that he see a hand specialist to address any lingering neurological issues, Anthony was never taken to see one. Anthony still lacks full feeling on his left index finger.

In early November 2019, Anthony's top bunk fell on top of him, knocking him unconscious. Although he likely suffered a concussion as a result of this incident and continues to experience headaches, he was never taken to the hospital. And in December 2019, following a "smoke fire" while he was housed in the 11 South wing of the MCC, Anthony and the rest of his tier were forced to wait outside for several hours on the MCC's rooftop without additional clothing.

Unfortunately, these incidents pale in comparison to what Anthony experienced in the first few months of 2020. On February 27, 2020 Anthony was residing on the 9 North unit of the MCC when the entire jail was immediately shutdown over suspicions that a loaded gun had been smuggled inside. For a week, Anthony, like many other detainees, was permanently confined to a tiny cell with no stimulation and fed nothing but the same frozen bologna and bread three times a day.

---

[1] Anthony was sentenced to a 90-day New York state parole violation before he was taken to the MCC in connection with this case. Anthony still has approximately four years and nine months remaining on this state sentence, which could he could be ordered to serve consecutively to any sentence this Court imposes.

Judge Lorna G. Schofield                                                    Page 7
United States District Judge

Some of the frozen food had even expired. Anthony was allowed to shower once on
March 1, 2020 at 1:30 a.m., then denied a shower for another week thereafter. He was
not given a change of clothes, soap, or other hygiene materials. On March 4, 2020
Anthony was transferred to the 5 South wing. He was strip searched and had all of his
belongings confiscated, including legal work. He never received any of his items back.

When the gun lockdown finally ended on March 11, 2020 Anthony was looking
forward to a reprieve. But instead, the worst pandemic during the past 100 years hit
the United States, with New York City as a major epicenter. Someone on Anthony's
tier contracted the virus and, a few days later, everyone else started coming down with
symptoms, including Anthony. These symptoms including fever, chills, his loss of
taste and smell. But despite this, Anthony never received attention from a doctor or a
nurse. Worse, the facility went back to lockdown mode and began serving the same
frozen bread and bologna it had during the gun lockdown. For the first month of the
outbreak, Anthony was confined to a small cell for 24 hours a day.

Almost worse than all of this is the fact that Anthony has not had a single
social visit since he was incarcerated at the MCC. No visits from his mother or sister.
And while he spoke to his mother with some frequency during the first few months
of his confinement, those calls have ceased. Anthony has had little to no contact with
his family for months and it is clear that they have all but abandoned him.

## II.    Argument

### A. Legal Standard

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of
18 U.S.C. § 3553(a)." United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013). That
provision directs sentencing courts to "'impose a sentence sufficient, but not greater
than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e.,
"proportionality, deterrence, incapacitation, and rehabilitation." Id.; see also United
States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006). "[D]istrict courts may
impose sentences within statutory limits based on appropriate consideration of all the
factors listed in § 3553(a)." Pepper v. United States, 562 U.S. 476, 490 (2011).  To be
sure, the guidelines range is one such factor, but it is only one, and "the Sentencing
Guidelines are just that, guidelines, and … 'they truly are advisory.'"  Douglas, 713
F.3d at 700 (quoting United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en
banc)).

Judge Lorna G. Schofield                                                                 Page 8
United States District Judge

In light of Anthony's personal history and characteristics, the causal
relationship between his drug addiction and the instant offense, and the mitigating
circumstances surrounding his confinement at the MCC, a sentence within the career
offender guidelines of 151 to 188 months in prison is grossly disproportionate and
greater than necessary to effectuate the goals of sentencing, particularly the need to
fashion a sentence that provides Anthony with mental health and substance abuse
treatment in the most effective manner. 18 U.S.C. § 3553(a), (a)(2)(D).

**B. The totality of Anthony's personal circumstances justifies a sentence
of 60 months' imprisonment.**

**1. Anthony's lifelong drug addiction, mental health struggles, and
cognitive impairments were essentially inherited and weigh
heavily in favor of a downward variance from his career-
offender guidelines.**

As set forth in Dr. Tussey's report, Anthony has experienced limitations in his
nonverbal abstract reasoning abilities his entire life. Ex. A at 13. These limitations in
Anthony's "intellectual and cognitive functioning warrant attention," as they have
impacted his ability to "attend to, process, learn, and utilize new information, and
have substantial implications for his daily functioning and involvement in future
programming." Id. Dr. Tussey determined that Anthony has an 82 IQ, placing him in
the 12th percentile, or low-average category for his age and educational background.
Id. at 11. Moreover, Anthony's verbal comprehension is in the 16th percentile, placing
him again in the low-average range. Id. at 12. When compared to others in Anthony's
age group, "95-99% or more of similar-aged peers performed better than him" in
areas of attention, verbal memory and cognitive flexibility. Id. at 13. None of
Anthony's prior efforts at intervention or behavioral correction have accounted for
these cognitive deficits.

From a biological perspective, Anthony likely has genetic, hereditary and
biological vulnerabilities to mental illness, substance abuse, and behavioral dyscontrol
that have not been adequately treated. Ex. A at 14. Anthony also endorses many
vulnerabilities to psychological illness, "including, but not limited to, growing up in
poverty and being raised by a mother who … essentially abandoned him." Id. The
trauma that Anthony endured in the context of minimal social support from his
family cannot be underestimated. Anthony's trauma not only compromised his
mental, physical, and behavioral health, but also contributed to his polysubstance
abuse in an effort to self-medicate the associated emotional pain. Id. Indeed,
Anthony's reported substances of most frequent abuse—methamphetamines, alcohol,

Judge Lorna G. Schofield                                                           Page 9
United States District Judge

and heroin—"can profoundly negatively affect many aspects of one's mental health cognition, such as executive functioning, memory, and behavioral control." Id. at 15. According to Dr. Tussey:

> "These vulnerabilities undeniably have contributed to and/or exacerbated [Anthony's] addiction, which has likely led to changes to his brain chemistry and prefrontal cortex- a part of the brain often affected by substance addiction. [P]olysubstance addiction can result in changes to brain functioning, mental and physical health, and behavior. Research has found that individuals with long-term abuse tend to have greater neuropsychological impairments, leading to difficulties in controlling one's behavior, memory, and decision making. Often these deficits are dose dependent- that is, the larger amounts of substances used by [Anthony], the greater likelihood of drug-related neuropsychological consequences."

Id. at 16.

From a social perspective, Anthony grew up in a culture steeped in violence and drugs. Ex. A at 15. He routinely did not feel safe in his own neighborhood and on the streets. "By all accounts, it seems [Anthony] has had to learn to cope by himself." Ex. A at 15. Worse, his years of involvement in the criminal justice system have "led to negative social influences, as well as missed opportunities to form healthy supportive relationships." Id. Taken together, Anthony's "biological predispositions and vulnerabilities, psychological factors, and social influences help provide context for his current circumstances." Id. at 16. Put differently, Anthony's "current legal circumstances seem most attributable to his substance addiction." Id. And while this does not excuse Anthony's behavior, "it does, along with his aforementioned history of abandonment, neglect, and trauma, all of which is thought to have cumulative effects, provide useful context in which to understand how he got where he is today." Id. Individuals like Anthony "have a greater chance at success with specialized treatment to address both his trauma history as well as his substance abuse," as such a program "can provide the best chance of reducing his risk for recidivism, relapse, and/or mental/illness." Id.

Dr. Tussey's conclusions carry significant weight and must inform this Court's assessment of an appropriate sentence. As Dr. Tussey writes:

> "After synthesizing all available data, the diagnoses most consistent with [Anthony's] current presentation are stimulant abuse disorder, alcohol

Judge Lorna G. Schofield                                            Page 10
United States District Judge

> abuse disorder, opioid abuse disorder, and potentially others, such as
> cannabis abuse disorder, all in early remission, in a controlled
> environment. He also currently meets criteria for major depressive
> disorder, and he has a history of ADHD and panic disorder without
> agoraphobia diagnoses.
>
> "Ongoing substance abuse relapse prevention is necessary (residential
> while in custody if possible, followed by outpatient as a follow up), as
> the relationship between polysubstance abuse and [Anthony's] behaviors
> is paramount. Again, comprehensive programming, which focuses
> simultaneously on trauma-focused recovery, social and familial issues,
> physical wellness, and his reported triggers for substance use, is strongly
> recommended. … Interventions from Dialectical Behavioral Treatment
> (DBT), a therapeutic approach focused on mindfulness, increasing
> interpersonal effectiveness, emotional regulation, and tolerating distress,
> may be successful. Again, it is imperative that any treatment options take
> into account his cognitive weaknesses, especially his memory, and DBT
> can be modified accordingly. Also, it will be important that [Anthony's]
> medication regime is monitored closely."

Ex. at 16.

Of course, not all hope is lost, as Anthony has "several prognostic indicators
that raise optimism for incremental success should he be granted educational,
occupational, and rehabilitative opportunities. Perhaps most important is his
acceptance of responsibility and insight into the impact of his substance abuse, and
his need for relapse prevention as well as mental health treatment to address his
trauma history." Ex. A at 17. It is paramount that the Court fashion a sentence that
will hasten Anthony's commitment to robust in-patient mental health and substance
abuse treatment.

Indeed, it is unlikely that Anthony will get the treatment he needs in an
overcrowded BOP facility. See Dep't of Justice Federal Prison System Fiscal Year
2019 Performance Budget, at p. 7 (projecting BOP to operate at 16% over its rated
capacity), available at https://www.justice.gov/jmd/page/file/1034421/ download.
The BOP's health service units are also grossly understaffed. In March 2016, the
Department of Justice's Office of the Inspector General released a comprehensive
review of BOP's "medical staffing challenges," describing the situation in at least
some facilities as a "crisis." See Review of the Federal Bureau of Prisons' Medical

Judge Lorna G. Schofield                                                    Page 11
United States District Judge

<u>Staffing Challenges</u>, at p. i (Mar. 2016), available at
https://oig.justice.gov/reports/2016/e1602.pdf.

      Within these severely overcrowded, understaffed prisons, roughly 44% of male
inmates suffer from mental health problems. <u>See</u> DOJ, Bureau of Justice Statistics,
<u>Mental Health Problems of Prison and Jail Inmates</u>, p. 4, Table 3 (Sept. 2006),
available at: https://www.bjs.gov/content/pub/pdf/mhppji.pdf. But a very small
percentage of these individuals ever receive And yet, a very small percentage ever
receive professional mental health treatment. <u>See id.</u>, p. 3 (Table 1) & p. 9 (Table 14).
An informal survey conducted by the Federal Defenders of caseload per psychologist
at BOP facilities in the Northeast, any of which is a likely destination for Anthony,
estimated an average caseload for each psychologist as 200 patients per doctor. Given
the number of mentally ill patients, the overcrowded facilities, and the dearth of
treating psychologists in prison, Anthony is unlikely to receive the type of therapy that
he needs while incarcerated.

      For Anthony, the necessity of providing effective, comprehensive mental
health treatment is manifest. And while he will not receive the type of treatment he
needs while incarcerated, he can receive it while under supervision.

      **2.  A significant downward variance is necessary to avoid an
          unwarranted disparity in sentences between Anthony and other
          similarly-situated defendants, and will still provide adequate
          deterrence.**

      Given Anthony's circumstances, a sentence of no greater than 60 months
would be proportionate to other similarly-situated defendants in the SDNY.[2]
Significant downward variances are particularly common where, as here, the
defendant has committed a robbery because of mental health and drug abuse issues.

      In <u>United States v. Antoine Blount</u>, 12 CR 670 (RJS), Judge Sullivan noted that
a defendant who commits a bank robbery as a product of mental health problems, as
in Anthony's case, is "less culpable" than "someone who just went in there because

---

[2] In the 2018 fiscal year, courts in this District sentenced defendants below the
advisory sentencing Guidelines in 79.3% of robbery cases (or 66.6% excluding all
cooperators). <u>See</u> Table 10, U.S.S.C., Statistical Information Packet, Fiscal Year 2017.

Judge Lorna G. Schofield                                                    Page 12
United States District Judge

they wanted a lot of money and they were unwilling to get it legitimately and they
didn't mind putting people in harm's way." May 9, 2013 Sentencing Transcript,
available at Dkt. No. 26. See also United States v. Velazquez, 10 CR 1075 (VM) (May
7, 2012) (imposing a 20-month sentence, with a 51-63 advisory Guidelines range, on
48-year-old defendant whose bank robbery offense was explained in part by
psychological issues); United States v. McGown, 14 CR 85 (JPO) (July 31, 2014)
(imposing a 36-month sentence, despite 78-97 month Guidelines range, where
defendant's bank robberies were the product of a heroin addiction).

     Judges Torres, Caproni, Daniels, Oetken, and Furman also have variedly
significantly downward in robbery cases where the offense conduct was explained by
mental health and drug addiction. For example, in United States v. Jason Lopez, 15
CR 0200 (GBD), Judge Daniels imposed a sentence of 24 months to be followed by a
period of long term residential drug treatment. Mr. Lopez's offense conduct involved
several robberies of bodegas and hair salons in the Bronx. In imposing a sentence of
24 months, Judge Daniels recognized that long periods of incarceration fail to address
the underlying issue of substance abuse which motivated Mr. Lopez's criminal
conduct. Oct. 6, 2016 Sentencing Transcript, available at Dkt. No. 29.

     In United States v. Anderson Corporan, 15 CR 887 (AT), Judge Torres also
imposed a sentence of 24 months, substantially below the advisory guideline range of
84 to 105 months. Mr. Corporan committed a robbery brandishing what appeared to
be a firearm. During the robbery, an associate of Mr. Corporan tied up an employee
of the jewelry store. Mr. Corporan also had a lengthy criminal history and had served
substantial prior terms of incarceration. Judge Torres noted that Mr. Corporan's prior
terms of incarceration "have been ineffective in putting an end to Mr. Corporan's
history of substance abuse. This suggests that a shorter period of imprisonment along
with placement in a residential drug treatment program would better serve the goals
of specific deterrence and effectively provide correctional treatment." Sept. 6, 2016
Sentencing Transcript, available at Dkt. No. 33.

     Against this backdrop, a sentence no greater than 60 months is also sufficient
to deter Anthony and other similarly-situated individuals. Research shows that a more
severe sentence does not lead to greater specific deterrence for individual defendants.
See The Honorable Peggy Fulton Hora & Theodore Stalcup, Drug Treatment Courts
in the Twenty-First Century: The Evolution of the Revolution in Problem-Solving
Courts, 42 GA. L. REV. 717, 724 (2008). The same can be said for general deterrence.

Judge Lorna G. Schofield                                                    Page 13
United States District Judge

Studies have proven that more severe sentences do not result in greater general
deterrence. See Michael Tonry, Purposes and Functions of Sentencing, 34 CRIME
AND JUSTICE: A REVIEW OF RESEARCH 28-29 (2006) ("[I]ncreases in severity
of punishments do not yield significant (if any) marginal deterrent effects…. Three
National Academy of Science panels, all appointed by Republican presidents, reached
that conclusion, as has every major survey of the evidence."). Evidence-based studies
strongly support the conclusion that it is the certainty of being prosecuted rather than
the severity of punishment that deters crime. See Five Things About Deterrence, Nat'l
Inst. Of Just., (June 2, 2016), available at:
https://nij.ojp.gov/library/publications/five-things-about-deterrence. The fact that
Anthony was prosecuted, jailed, and punished will provide sufficient general
deterrence; a lengthy additional term of incarceration is greater than necessary.

### C. Anthony's unique and unprecedented confinement conditions at the MCC constitute punishment beyond that necessary to effectuate the goals of sentencing and warrant less time in prison.

It is also incumbent upon this Court to consider that Anthony has been
incarcerated at the MCC during the worst pandemic in this country during the past
100 years. Not only did Anthony likely contract COVID-19 in prison, the Court must
be mindful that his experience in prison as a result of the pandemic, the preceding
gun lockdown, the ensuing lockdown, and his own illness was unduly frightful and
harsh. As Judge Engelmayer recently noted in a sentencing proceeding in which he
chastised the government for failing to acknowledge the mitigating aspects of the
defendant's confinement at the MCC during the pandemic:

> "Prison is supposed to be punishment, but it is not supposed to be
> trauma of that nature or close. My colleagues and I commonly informally
> credit prisoners who have served time awaiting extradition in dreadful
> prisons overseas with more time served than measured by the calendar.
> The same logic applies here, and then some."

United States v. Juan Carlos Aracena De Jesus, 20 Cr. 19 (PAE), July 1, 2020
Sentencing Transcript at 36 (attached as Exhibit C).

Anthony's time at the MCC was way harder than anyone intended it to
be when he was first detained following his arrest. When Anthony was
arraigned, there was no way to predict that the time he would be spending, in
effect under the Court's supervision, would be spent under the horrific
conditions created by the COVID-19 pandemic and other unforeseen

Judge Lorna G. Schofield                                              Page 14
United States District Judge

circumstances. Any mature system of justice must recognize the unexpected
and regrettable ardors Anthony experienced while at the MCC, mainly through
a reasonable downward variance.

> **D. Anthony's reentry plan, which is tailored to address the overlap of his addiction and acute mental health needs, supports hastening his admission to in-patient substance-abuse treatment and supervision.**

Anthony has worked very hard preparing a thorough reentry plan tailored to
his specific mental health and substance abuse needs. The plan reflects realistic goal
setting, Anthony's meaningful reflection on his actions, and a blueprint for how he
can use his time on supervised release productively. Anthony's plan identifies specific
programs for him to enroll and participate in, and even provides concrete steps he can
take to gain employment.

For example, Anthony plans on enrolling in the Center for Recovery and
Wellness, the in-patient program through Educational Alliance. The CRW utilizes a
wide range of evidence-based clinical services, such as individual psychotherapy
alongside group work, case management, and vocational services. Individual
psychotherapy will be critical for Anthony, as the benefit of psychotherapy in an in-
patient treatment setting is the ability to control all other environmental variables.
Anthony will not have access to illicit drugs, and he will have stability. He will see the
same therapist regularly, regularly eat healthy meals, and sleep in the same bed every
night. Anthony has not had the opportunity to focus solely on himself and on the
underlying issues pertaining to his polysubstance abuse without any distractions.
Having never had the benefit of rigorous in-patient treatment before, Anthony is
excited at the prospect of using the resources available to him through U.S. Probation
to reach his full rehabilitative potential on supervised release. His reentry plan is a
roadmap for his post-release success that demonstrates the seriousness with which he
is approaching his redemption. Anthony is proud of the plan he crafted and is anxious
to put it into practice.

### III.   Conclusion

Anthony's offenses are directly attributable to his substance abuse disorder and
mental health struggles. Anthony has readily taken responsibility for his actions and
has put together a reentry plan designed to maximize the likelihood that this will be
his last encounter with the justice system. And having already served a brutally hard
period of confinement at the MCC, there is even greater justification to vary below

Judge Lorna G. Schofield                                        Page 15
United States District Judge

the guidelines. Given the totality of the circumstances, a sentence no greater than 60 months' imprisonment followed by three years of supervised release is appropriate.

<div style="margin-left:40%">

Respectfully Submitted,

/s/Andrew J. Dalack_____
Assistant Federal Defender
Federal Defenders of New York, Inc.
(212) 417-8768

Attorney for Anthony Flynn

</div>